STATE ex rel. ROBERTSON, Superintendent of Banks, v. MORIAR-TY et al.—95 S. W. (2d) 70.

Western Section. June 6, 1935.

Petition for Certiorari denied by Supreme Court, June 13, 1936.

Craig & Durham and C. S. Carney, Jr., all of Ripley, for appellants.
Steele & Steele, of Ripley, for appellee.

KETCHUM, J. This is one of several suits growing out of the failure of the First State Bank of Ripley, and is referred to as the $10,000 bond case. The suit was brought by the superintendent of banks in his capacity as receiver of said bank, against V. P. Moriarty and others, directors of said bank and sureties on a bond executed for the protection of the depositors and creditors of said bank under the provisions of sections 5963 and 5968 of the Code. The chancellor decreed in favor of complainant, and the defendants have appealed and assign as error that said decree is erroneous because:

(1) The bond was taken under duress.

(2) There was no authority in law for the taking or execution of such a bond.

(3) The superintendent of banks did not comply with the law in exacting this bond.

(4) The bank was not unsafe and insolvent as stated in the face of the bond.

(5) The appellants were entitled to a ''reasonable time'' within which to strengthen the bank after it became unsafe.

The First State Bank of Ripley was organized for the purpose of purchasing the assets and assuming the liabilities of the First National Bank of Ripley and the First Savings Bank of Ripley, both of which were in practically a failing condition. The First National Bank and the First Savings Bank had been in business for a number of years; the stockholders, directors, and officers in the two banks were practically the same, and they occupied the same banking house. The First National had a paid-up capital of $25,000, and the First Savings had a paid-up capital of $12,500. In the fall of 1931 both banks were having trouble on account of poor collections; the comptroller of the currency had notified the officers of the National Bank that unless they could realize on some of their paper so as to get more cash into the bank by January 1, 1932, he would make an assessment of 100 per cent against the stockholders on their stock. The superintendent of banks was likewise urging the officers of the First Savings Bank to get its affairs into better shape. His predecessor in office had already taken a bond in 1923 for $10,000, signed by all the directors, for the benefit and protection of the depositors.

Several plans for relieving the condition of said banks were suggested, and it was finally determined to organize a new state bank, to be known as the First State Bank, to take over the assets and assume the obligations of the other two banks, and this was done with the consent of the comptroller of the currency, and under the supervision of the state superintendent of banks. The new bank was organized by the stockholders of the old banks, and the officers and directors were practically the same. The capital stock was fixed at $25,000, all of which was paid in. The superintendent of banks at first stated

that under the law a capital of $50,000 would be required, but upon being shown that Ripley had a population of only 2,325, and, that under the law, banks might be organized with a capital of $25,000 in towns of less than 2,500 population, he agreed that this bank might be opened with a paid-in capital of only $25,000, but suggested and rather insisted that it should be capitalized at $50,000. All the negotiations with the superintendent of banks with reference to this merger were had by Mr. Prichard, the cashier of the First National Bank.

Mr. Robertson, the superintendent, sent an examiner to Ripley to examine the banks which were to be absorbed by the new bank, and a report of the condition of said banks was made as of date December 16, 1931; and in a letter to Prichard, of date December 22d, Robertson inclosed a copy of the examiner's report, and after analyzing it to some extent, he concludes:

"It is, therefore, apparent that if the assets of these institutions are combined into one institution with $50,000 capital, the new organization would hold approximately $43,400 of assets which the directors admit to be questionable. Unless the doubtful assets above referred to can be eliminated entirely, and the proposed new banks set up with $50,000 clean working capital, this office cannot approve the proposed consolidation."

Prichard had another conference with Robertson at Brownsville on Christmas Day, and Robertson then agreed that the new bank might be incorporated with a paid-in capital of $25,000; but he made the further requirement that a new bond of $10,000 be executed by the directors. Prichard admits that the execution of this bond was discussed at the Brownsville conference, but says he told Robertson that the old bond had expired by limitation, that he did not want to sign a new one, and that he did not believe the directors would sign a new one. Robertson testifies that he told Prichard they would have to execute a new bond, and that he very readily consented to do so, and we think the record supports his statement, especially in view of the fact that he was yielding his insistence that the new bank should have a paid-in capital of $50,000.

At this time it was understood that application would be made at once for the charter of the new bank, and that when it was returned, Mr. Hunt, a bank examiner, would be sent to Ripley to represent the superintendent in the merger of the banks. The charter was obtained and Mr. Hunt arrived in Ripley on the afternoon of December 30, 1931, and at once began the work of checking over the assets of the old banks which were to be taken over, and the liabilities which were to be assumed by the new bank, and in making up the statement of the new bank which was to be opened on the following day. This work required all the afternoon and until late on the night of the 30th. The officers and directors were concerned as to the effect which the

closing of the old banks and the opening of the new might have on the depositors, and the possibility of a run on the bank was feared; and most of the directors were present before the opening hour on the morning of the 31st. At this time Mr. Hunt presented the $10,000 bond for the signatures of the directors. They at first protested upon the ground that they had not understood that a bond would be required, but Hunt stated that his instructions were to get it, and that they could not open the bank unless they signed it. Mr. Miller, one of the directors, said "they have got our money, and there is nothing else for us to do except sign it," whereupon all the directors signed it. Hunt denies that there was any vigorous protest. On January 2d, the superintendent returned the bond of the First Savings Bank, properly canceled.

The new bond was on the usual printed form, and contained a recital that the superintendent had ascertained that the First State Bank was in an unsafe condition, and had made the requirement that it execute a bond for the protection of its depositors and unsecured creditors, and the condition was that the bank would "pay all sums owing to its depositors and unsecured creditors as they stand at present, or as they may appear at any time while said bank is allowed by said superintendent of banks, or his successor, to remain open and transact its business."

The new bank was opened for business on the morning of December 31, 1931, and continued to operate until the close of business on December 21, 1932, when it failed and was placed in the hands of the superintendent of banks for liquidation.

With this statement of the facts, we proceed to consideration of the assignments of error. The first is that the chancellor was in error in holding that the bond was not executed under duress. The theory of appellants with reference to this assignment is that the bond was executed under duress because, at the last moment, after all the plans had been made for the opening of the new bank and its merger with the two old ones, the appellants were required to execute this bond before the new bank would be permitted to commence business. The fact is that Robertson, in his conversation with Prichard on Christmas Day, had made the requirement that such a bond be executed, and Prichard, acting for the appellants, had agreed to it. Evidently Prichard did not tell all the appellants of this requirement, though he is positive that he did tell Mr. Folts, one of the directors. Prichard was the acknowledged representative of the appellants in all the negotiations with Robertson looking to the reorganization of the old banks, and they are bound by his agreement.

The merger of the banks could not be effected without the approval of the superintendent of banks, and he was required to examine into the condition of the merging banks, and to require a bond, if neces-

sary, for the protection of the depositors of the merged banks. Williams' Code, sections 6030.1, 6030.2.

This section of the code provides that no certificate shall be issued by the superintendent unless all liabilities 'of the constituent corporations are assumed by the consolidated or merged corporation, ''or are paid or payment is satisfactorily arranged.'' Under this provision we think the superintendent was warranted in exacting the $10,000 bond in lieu of the old bond which had been given by the First Savings Bank & Trust Company. Robertson v. Citizens' Bank of Watertown et al., 168 Tenn., 230, 77 S. W. (2d), 62.

We recognize the fact that a bond exacted by a public official under the pretended authority of his office, but which he is not legally authorized to require, is void. 9 Corpus Juris, title, Bonds, sec. 44, p. 28. But we think the superintendent of banks was acting within his authority in exacting a bond in this case as a condition to the merger of the banks.

It may be conceded that, technically speaking, the superintendent of banks was without authority to require the execution of a bond as a condition precedent to the opening of the new bank. But this was only a part of the plan. The plan contemplated not only the opening of the new bank, but also the absorption by it of the two old banks, which were in a failing condition. The moment the new bank took over the assets and assumed all the liabilities of the two old banks, its liabilities exceeded its available assets, because $43,400 of the assets were frozen and of doubtful value. Its $25,000 of capital stock was therefore wiped out, and the bank was actually insolvent. In this situation it was not only proper for the superintendent of banks to require a bond for the protection of the depositors as a condition to the merger, but we think it was his duty to do so.

It is clear from Robertson's letter of December 22d, as well as from his testimony, that he was insisting upon a paid-up capital of $50,000 in the new bank as a condition precedent to the commencement of business and the assumption by it of the obligations of the two old ones; and he says he consented to the organization of the new bank with only $25,000 capital because he thought it better to do that than to have the two old banks fail on the first of the year; and he says that Prichard very readily consented to the execution of the bond. Prichard admits the conversation about the execution of a bond, but says he did not understand that it was an ''absolute requirement.'' The appellants still had their option to refuse to sign the bond, and if they had refused to do so, the $25,000 could have been paid back to the stockholders without the bank having ever opened for business, or it could have opened for business without assuming the liability and taking over the assets of the old banks. But they knew that if they did this, the old banks would have to close on the following day, and

in that event they would have been assessed $25,000 on their First National Bank stock and would have been liable on the First Savings Bank bond. They were under the necessity of either signing the bond, or having the two banks in which they were interested placed in the hands of a receiver; and in this situation they elected to execute the bond. But this was not duress. This assignment of error must be overruled.

The remaining grounds of said assignment of error may well be treated together, as they all relate to the authority of the superintendent of banks to require the execution of such a bond as a condition to opening the bank. In fact, they have already been considered in what has previously been said. Section 5963 of the Code makes it the duty of the superintendent of banks to require a bond for the protection of depositors and unsecured creditors when he finds the bank in an unsafe condition. It might well be argued that there would have been no necessity for a bond if the bank had been opening its doors with $25,000 capital and no obligations, except for new deposits; but this bank was assuming at the outset obligations to depositors of about $346,000, and bills payable of about $50,000; and it was being organized because the assets of the old banks were frozen; the appellants themselves were uneasy for fear of a run when it became known that the old banks were in such condition that they had to be taken over by the new one. That the superintendent of banks shared this feeling, and thought it necessary to require this bond, is shown by the fact that he insisted upon having a paid-up capital of $50,000. It is insisted that the bank was not in an unsafe condition, as recited in the bond, but it is certain that the old banks were unsafe, and that the new one was only $25,000 better than the two old ones, and that the assets of the new bank were impaired to the extent of $43,400.

It is further insisted that appellants were entitled to a reasonable time within which to strengthen the bank after the superintendent found that it was in an unsafe condition. The superintendent had insisted all along that the new bank should have a capital of $50,000 paid in before it opened for business, and it was only when he had positive assurances from Prichard, the spokesman for appellants, that they could not raise the $50,000 in cash, that he agreed to let them open for business with only $25,000 paid in, together with the $10,000 bond. The execution of the bond was a condition precedent to the merger and had been agreed upon in advance; so the appellants were not entitled to further time within which to strengthen the bank.

A situation somewhat similar to this existed in the case of Robertson, Superintendent of Banks, v. Citizens' Bank of Watertown, 168 Tenn., 230, 77 S. W. (2d), 62, 65, above cited. In that case the superintendent of banks in August, 1927, required of the Citizens' Bank of Watertown the execution of a $15,000 bond for the protection of its

depositors; the bank then continued in business until September 25, 1928, when an arrangement was undertaken between the Citizens' Bank and the Bank of Watertown whereby the latter acquired the assets and assumed the liabilities of the former. All the assets of the Citizens' Bank were turned over to the Bank of Watertown, and the Citizens' Bank ceased to do business. The superintendent of banks, as a condition to the approval of this merger, required that the Bank of Watertown execute a new bond in like amount, but this bond was not executed, and the merger was, therefore, not approved. The Bank of Watertown failed in November, 1928, and the superintendent was appointed receiver, in the usual way, to liquidate its affairs.

The chancellor and the Court of Appeals concurred in holding that the merger had not been accomplished because the superintendent of banks had not given his approval. In a suit on the bond given by the Citizens' Bank it was held that the superintendent of banks was entitled to recover. The Supreme Court, in an opinion by Chief Justice Green, say:

"Regardless, therefore, of the validity of the consolidation of these two institutions, the superintendent of banks had no authority to impair the rights of creditors of the Citizens' Bank by a surrender of the bond taken for their protection, certainly until other adequate security was substituted for such bond. The superintendent of banks, it is conceded, did not surrender the bond upon which this suit is brought. The bond therefore stands for the protection of the depositors and creditors of the Citizens Bank, even if that bank be thought to have legally merged into the Bank of Watertown."

This case seems to recognize the right of the superintendent of banks to require the execution of a bond for the protection of depositors as a condition precedent to his approval of a merger of banks.

Upon a careful consideration of the record, we are of opinion that there is no merit in any of the appellants' assignments of error, and they are accordingly overruled. The decree of the Chancellor will, therefore, be in all respects affirmed at the cost of appellants and their sureties.

Senter and Anderson, JJ., concur.